_____

IN THE MATTER OF

S.L., THE MINOR STUDENT, THROUGH
THE PARENTS, SH.L. AND T.L.

*Plaintiff,*

V.                                                              NO. _____

RUTHERFORD COUNTY BOARD OF EDUCATION,
D/B/A RUTHERFORD COUNTY SCHOOLS,

*Defendant.*

_____

# COMPLAINT

_____

**COMES THE PLAINTIFF, S.L.,** the minor child, through her parents, S.L. and T.L. She shows:

## I.   INTRODUCTION

1. S.L. is an IDEA-eligible student with a disability who, because of disputes about her placement, including her "stay put" placement, has received *no education* since March of 2023.

2. This action seeks to remediate that utter lack of education, including provision of compensatory education and an appropriate placement to deliver FAPE and equal access. Administrative exhaustion through an IDEA due process hearing has occurred, at which time S.L. was the prevailing party on the denial of a Free Appropriate Public Education.

## II. PARTIES, JURISDICTION, AND VENUE

3. S.L. is a minor student with a disability who resides with her parents, Sh.L., her father, and T.L., her mother, in Murfreesboro (Rutherford County), Tennessee.

4. Rutherford County Board of Education, d/b/a Rutherford County Schools (RCS) is the local education agency ("LEA") for Rutherford County, Tennessee. It receives federal funding and must provide special education to students who, like S.L., are eligible under the IDEA.

5. This action arises under the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1400 *et seq.* Jurisdiction is conferred upon this Court by the Individuals with Disabilities Education Act (IDEA), 20 U.S.C. §§ 1415(i)(2)(A) and 1415(i)(3)(A), which provide district courts of the United States with jurisdiction over any action brought under the IDEA, without regard to the amount in controversy.

6. Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b), as Plaintiff resides within the boundaries of the Middle District of Tennessee and all events and omissions giving rise to this Complaint occurred in Rutherford County, within this judicial district.

7. Administrative exhaustion occurred through a state due process hearing with a Final Order by Administrative Law Judge Claudia Padfield dated April 8, 2024. This appeal is therefore timely, brought within sixty (60) days thereafter.

## III. FACTS

8. S.L. has pervasive disabilities of both autism, intellectual disability, verbal apraxia, a seizure disorder, and memory loss. She is currently nineteen (19) years old, and the IDEA provides her a free appropriate public education (FAPE) until the age of twenty-two (22).

9. S.L. is substantially limited in numerous major life activities. These include learning, reading, writing, and activities of daily living. She cannot drive, handle money or

2

Case 3:24-cv-00601   Document 1   Filed 05/14/24   Page 2 of 15 PageID #: 2

finances; she needs help with the restroom; she cannot wash her hair, groom, dress herself, or brush her teeth without assistance. She cannot live independently.

10. In 2021-2022 school year, S.L., then 16, enrolled at her zoned school of RCS's Siegel High School where she was placed in a self-contained special education classroom.

### *The 2022-2023 IEP*

11. In February of 2022, S.L.'s IEP Team created a new annual IEP: February 7, 2022 to February 7, 2023. This IEP also placed S.L. at her zoned school of Siegel High School in a self-contained special education classroom.

12. On July 25, 2022, S.L.'s parents unilaterally enrolled her at Norris Academy, a residential acute treatment facility in Andersonville, Tennessee. Norris is a six-month program. It does not extend past a student's 18th birthday. Being a unilateral placement by the parents, it did not change S.L.'s "stay put" placement.

13. Beginning in November of 2022, S.L.'s parents attempted to set up transition meetings for S.L. to safely return from Norris back to Siegel High School.

14. Norris discharged S.L. in December of 2022. But due to the holidays, the IEP Team did not convene until January of 2023, as her annual IEP remained operational until February of 2023.

15. On January 3, 2023, S.L. returned to her zoned school, Siegel High School, still under her 2022-2023 annual IEP.

16. In January and February, 2023, the IEP Team discussed placements. During this time, RCS utilized at least two aides, and no peer interactions. According to RCS, "she was getting work done, getting things accomplished while she was there."

3

17. On February 22, 2023, a few weeks after the expiration of the IEP, the IEP team held its annual IEP meeting. The draft IEP, under "Current Descriptive Information," stated that "[S.L.] excels in a one-on-one/two setting."

18. But RCS members did not wish to continue S.L.'s placement at Siegel, with at least two aides (one being Dr. Crismon who was working itinerantly).

19. The draft IEP, written by RCS, including a line that S.L. be placed a private school called Rutherford Academy. Under "LRE and General Education," the draft simply said that S.L.'s "needs can best be met at Rutherford Academy."

20. S.L.'s parents visited Rutherford Academy in good faith. They had a number of serious concerns. First, they learned that S.L., who has a serious intellectual deficit, with an IQ estimated at 40 or below, would be the only female in a classroom of all males with extensive disciplinary histories and behavioral challenges. Thus, they quite reasonably believed that Rutherford Academy's overarching disciplinary focus was incompatible with S.L.'s unique needs and level of functioning.

21. Second, Rutherford Academy lacked fencing and it is located adjacent to a highway. And S.L. was a frequent "eloper." This placement would pose a danger to her. And the danger was particularly acute because Rutherford Academy is located in a high crime area.

22. Additionally, Rutherford Academy is substantially used for students needing behavioral modifications and, often, they can present a risk of danger to self or others.

23. For these reasons, S.L.'s parents *rejected* Rutherford Academy as an appropriate placement for S.L.'s needs. Together with RCS, the parties considered many other placements—but most were incompatible because of S.L.'s age or unique needs.

### Change of Placement without Prior Written Notice

24. Ultimately, the parties did not reach an agreement on placement post-Norris. Such disagreement over placements of a child with special needs are hardly unusual. But when a school district decides to make a change of placement decision *without the parent's approval,* it must issue a "Prior Written Notice." See 34 C.F.R. §300.503.

25. This "PWN" not only gives notice of the action to be taken by the school district unilaterally, but explains why the district is proposing the placement, the evaluations and data supporting the decisions, procedural safeguards available to the parents, other options considered, and why those options are being rejected. *Id*.

26. Instead of issuing PWN of a change S.L.'s placement to Rutherford Academy, RCS wrote an *email* to S.L.'s lawyer, after-hours on March 8, 2023. It stated in full:

> As of the writing of this email, the parents have not signed the IEP that was developed on 2/22/23. RCS also has not received notice of filing of any administrative matters that would toll the running of the 14-day time period before the IEP goes into effect.
>
> Today is 3/8/23, which is 14 days after the development of the IEP. As such, the student's placement is no longer at Siegel High School and is instead at Rutherford Academy, as stated in the IEP. Going forward, the parents may contact Rutherford Academy to arrange registration. Again, please note, Siegel High School is no longer the student's placement.

27. That following morning, March 9, 2023, S.L. was departing her vehicle to enter Siegel High as usual. RCS faculty met her at the vehicle and blocked her from entering the school. Despite not issuing Prior Written Notice with the appropriate information regarding the basis of its proposed placement along with her procedural safeguards, RCS claimed her placement *already had been changed* to Rutherford Academy.

5

28. Operating off its March 8, 2023 email, despite the lack of PWN, RCS took the position that S.L. had not filed due process to "toll" the IEP from taking effect at Rutherford Academy. Accordingly, RCS barring her entry to the school denied her FAPE and access to her rightful education at her zoned school of Siegel High.

29. To the contrary, as S.L.'s father would testify:

> As I said, we previously rejected the placement
> when it was mentioned about Rutherford Academy. We
> signed the IEP rejecting it. We verbally rejected it.
> One night at, like, 5:30 an e-mail was sent and
> it said: "As your client has not signed the IEP, as you
> know, this enacts some 14-day rule. Rutherford Academy
> is now her placement.

(Transcript Day 1, pp. 79-80).

30. And as S.L.'s mother testified:

> [We] rejected the IEP, which was supposed to have put a stay put was what we were told to be the case. It wasn't. Then we filed due process, then we filed a temporary restraining order, then we filed a federal lawsuit. So I think we have done everything in our ability legally, to our knowledge, to reject [Rutherford Academy] as a placement. So, therefore, we haven't even discussed it since a year ago.

(Transcript Day 2, pp. 365-66)

31. On or about March 13, 2023, S.L.'s parents filed a request for a due process hearing to enjoin Rutherford Academy as the placement. (DP No. 1: 07.03-231527J). They also sought such injunctive relief by filing suit in United States District Court.

### *Settlement Agreement Changes Stay Put from Siegel High to Illuminate Academy*

32. With the legal actions pending, and S.L. still receiving no education, the parties attended a mediation with a state hearing officer.

33. On June 8, 2023, the parties entered a Settlement Agreement *changing* S.L.'s stay-put placement to Illuminate Academy "beginning Fall 2023" and lasting until S.L. reached aged twenty-two (22). This agreement also afforded S.L. "compensatory education" in the form of the six-week summer program at Illuminate Academy.

34. Illuminate Academy is an educational program offering tailored instruction to persons with autism and cognitive deficits. Therapeutic in nature, it utilizes the SCERTS model.[1] SCERTS focuses upon functional communication, emotional expression, creating trusting relationships, and sensory supports. It prioritizes the abilities and supports that will lead to the most positive long-term outcomes as indicated by the National Research Council (2001; Educating Children with Autism). *https://scerts.com/the-scerts-model/ (*last visited May 9, 2024). Illuminate also offers Applied Behavioral Analysis (ABA) to increase achievement and social awareness. The parties determined this type of instruction and therapy were appropriate. Typically the students remain until adulthood.

35. Under the Settlement Agreement, "[t]he student will enroll at Illuminate Academy for the Fall 2023 semester. RCS would be responsible for tuition at Illuminate Academy as long as the student is placed there, but no later than the student's 22nd birthday." This was in keeping with the IDEA's promise of a free appropriate education until the age of 22.

36. The Settlement Agreement contemplated that, at least initially, S.L. would not need a 1:1 assistant at Illuminate. But "[i]f a one-on-one assistant is needed in the future, RCS will be responsible for expenses related to that educational assistant."

---

[1] "SC" – Social Communication; "ER" – Emotional Regulation; "TS" – Transactional Support.

37. The Settlement Agreement was signed by both S.L.'s parents and RCS. Thus, it constituted an *agreed upon* change in placement, becoming the "stay put."

## *Services Not Provided at Illuminate*

38. In the summer of 2023, S.L. did attend the summer program at Illuminate. It became apparent that a 1:1 assistant was necessary for S.L. to safely attend Illuminate that fall.

39. Per the Settlement Agreement, RCS remained responsible for funding the 1:1 services (by contract and by law). However, Illuminate was unwilling or unable to hire the necessary 1:1 aide. And despite some efforts, RCS's representative acknowledged that "I think I could have pushed harder as far as, you know, could we have hired somebody to place there [at Illuminate Academy]."

40. As a result, S.L. was unable to attend school, having received no education since Rutherford County barred her access on March 8, 2023.

41. Instead of demanding Illuminate *provide* the 1:1 aide or return her to Siegel High with comparable aides, and at least providing compensatory education, RCS merely offered non-comparable "homebound" services to S.L. With homebound, S.L. would have *no* access to any peers and would not even receive a full day or week of education. A teacher would show up at the house for a handful of hours per week, necessitating a parent be home. Even RCS agreed that homebound was not appropriate. As a result, homebound was scrapped and S.L. remained without any education.

42. With Illuminate balking on the aide, and with RCS refusing a return to public school, S.L. remained in limbo. S.L.'s parents diligently sought out private opportunities that

8

would enroll S.L., given her disabilities and age. She was accepted for enrollment at Benedictine Academy and the parents made RCS aware of this opportunity (among many others considered).

*Due Process Filed*

43. On November 22, 2023, with S.L. receiving *no education* since March of 2023, S.L. filed another due process complaint (DP No. 2—No. 07.03-236527J). This due process complaint stated the obvious denial of FAPE because S.L. "has not been in school since August 2023." (*Id.*)[2] With RCS refusing to provide the necessary 1:1—at Illuminate or at her zoned school—S.L. requested residential placement.

*ALJ Decision*

44. On April 8, 2024, in a Final Order, the ALJ set forth an "applicable time frame" … [of] "June 8, 2023 to the present." (Final Order, p. 13). It was during this time that S.L. received no education.

45. The ALJ correctly observed that S.L.'s placement *changed* with the June 8, 2023 Settlement Agreement to Illuminate Academy. (*Id.*) However, the ALJ inexplicably reasoned that "it is solely Petitioners' fault that the IEP was not updated to reflect this change of placement." (*Id.*)

46. To the contrary, Petitioners cannot update their own IEPs. The agreement was reached by the school and Petitioners, at a state-sponsored mediation, thereby bilaterally changing S.L.'s stay put placement.

47. The ALJ then found that, when Illuminate "fell through," placement "*defaulted* to the placement on her disputed IEP, which was Rutherford Academy." (*Id.*) To the contrary,

---

[2] She had not been educated since *March* in total, since August of that school year.

Rutherford Academy was *not* the placement on her last IEP. First, the parents *rejected* Rutherford Academy at the February 2023 IEP meeting. Second, RCS *never* provided a Prior Written Notice to challenge. Third, the parents *did* file due process immediately after receiving the March 8, 2023 after-hours email.

48. Ultimately, the ALJ did find that RCS denied S.L. a FAPE from June 2023 through March 2024. RCS failed to adequately evaluate S.L. to properly develop an IEP for placement. (*Id.* at p. 23). For relief, the ALJ provided a remedy of a new Functional Behavior Assessment, a new Behavior Improvement Plan, a safety plan, and a psychoeducational assessment. (*Id.* at p. 23). However, this did not afford S.L. a *placement* and to the extent the ALJ was implying a placement at Rutherford Academy, that is clearly incorrect.

49. After the ruling, S.L. *again* tried to return to her zoned school of Siegel High with a 1:1 aide. And once again, RCS barred her from school. Its superintendent wrote: "Please be aware that under the existing IEP, [S.L.'s] current educational placement is Rutherford Academy. Siegel High School is not her educational placement; thus, she should not present herself at Siegel."

50. Again, this is legally incorrect. RCS violated the IDEA's procedural safeguards in trying to *unilaterally* change S.L.'s placement to Rutherford Academy. Her placement under the last agreed upon IEP—the stay put—is Illuminate (and before that, Siegel High). Thus, RCS caused substantive harm, denying her FAPE, by barring S.L. from accessing her education *again*.

## IV. LEGAL CLAIMS

### Count I. Violations of the IDEA

51. First, having been declared the prevailing party for the denial of FAPE, and receiving a remedy of new evaluations, etc.. Plaintiffs first seek their attorneys' fees and reasonable

10

expenses. That includes the due process and this action pursuant to the IDEA. 34 C.F.R. §300.517; 20 U.S.C. § 1415(i)(3).

52. Second, S.L. remains without FAPE and without a placement given the procedural harm of changing the placement without a Prior Written Notice, resulting in the substantive harm of lack of education. Accordingly, she invokes "stay put" to receive comparable services as Illuminate, including through the 1:1 aide.[3]

---

[3] *Illuminate's* refusal is no barrier:

> "Courts have also held that when there is a change in circumstances, such as the closure of a school, "a district is required to provide the student with a similar placement which closely replicates the last agreed-upon and implemented placement." J.M., 2018 WL 6075349, at *7; see Van Scoy, 353 F.Supp.2d at 1086 ("The stay-put provision entitles the student to receive a placement that, as closely as possible, replicates the placement that existed at the time the dispute arose, taking into account the changed circumstances."). Here, the unrebutted evidence is that residential care or comparable at-home services are "necessary to provide special education and related services" to plaintiff.
>
> [D]efendant asserts that compliance with the stay-put provision is "impossible" because it "has no control of the admission process and enrollment of these third-party residential treatment centers." Defendant cites no authority suggesting that its difficulties locating a new placement for plaintiff excuses its legal obligations under § 1415(j). (See, generally, id.). Indeed, the ALJ rejected a similar argument. (See Dkt. 10-8, Exh. 5, ALJ Order at 3) ("[The District] argues that it cannot maintain stay put when the Texas facility is unavailable, and further argues that it is investigating but has, so far, been unable to locate a comparable placement. . . . [The District] further contends that Student has not identified a comparable placement, in the absence of such identification by Student, the motion should be denied. None of these arguments defeat Student's right, as a matter of law, to stay put, according to the terms of the agreed to IEP.").

K.K. v. William S. Hart Union High Sch. Dist., 2022 U.S. Dist. LEXIS 73451, *14-16 (C.D. Cal. 2022).

53. Third, based upon the testimony at due process, and S.L.'s current functioning, she submits that a residential placement, e.g. Benedictine Academy, be provided. She has been accepted for enrollment, and a spot is still being held at Benedictine. S.L. seeks the appointment of an educational consultant at RCS's expense to assist in determining a placement, Benedictine or other, that is ready, willing, and able to serve S.L.[4]

54. Fourth, for the procedural and substantive harms from June 8, 2023 forward, S.L. seeks compensatory education for all of the time she has been, and continues to be, denied a FAPE.

### Count II. Denial of 504-FAPE and 504/ADA Discrimination

55. Under Section 504 and its counterpart, the ADA, RCS is violating S.L.'s rights to 504-FAPE along with equal treatment under Section 504/ADA, each and every day, as follows.

56. First, under Section 504, RCS denied S.L. 504-FAPE and discriminated against her by:

> a. excluding S.L. from participation in, and denying her the benefits of, a full school day, and otherwise discriminating against her, 34 C.F.R. § 104.4(a);
>
> b. failing to provide her with a free appropriate public education, including special education and related aids and services that are designed to meet her needs as adequately as the needs of nondisabled children are met and that adhere to the procedural safeguards set forth in Section 504, § 104.33;

---

[4] These placements are limited by space, S.L.'s disability-related needs, and being over 18 (many only serve through age 18).

c. denying her an educational opportunity that is equal to the opportunity afforded other children, § 104.4(b)(1)(ii);

d. denying her educational services that are as effective as the services provided to other children, § 104.4(b)(1)(iii);

e. unnecessarily providing her different or separate educational services, § 104.4 (b)(1)(iv);

f. aiding or perpetuating discrimination against her by providing significant assistance to local school districts that discriminate against these children on the basis of disability, § 104.4(b)(1)(v).

57. Second, under Title II of the ADA, RCS has discriminated against S.L. by:

a. excluding the S.L. from participation in, and denying her the benefits of, a full school day, and otherwise discriminating against her, 28 C.F.R. § 35.130(a);

b. denying her an educational opportunity that is equal to the opportunity afforded other children, § 35.130(b)(1)(ii);

c. denying her educational services that are as effective as the services provided to other children, § 35.130(b)(1)(iii);

d. unnecessarily providing her different or separate educational services, § 35.130(b)(1)(iv);

e. aiding or perpetuating discrimination against her by providing significant assistance to local school districts that discriminate against these children on the basis of disability, § 35.130(b)(1)(v);

13

f. utilizing methods of administration that have the effect of subjecting her to discrimination on the basis of disability, have the effect of substantially impairing accomplishment of its objectives for students with disabilities, and perpetuate the discrimination of local school districts against these children, § 35.130(b)(3);

g. failing to reasonably modify their policies, practices, or procedures as needed to avoid discrimination on the basis of disability, § 35.130(b)(7); and

h. failing to provide her educational services, programs, and activities in the most integrated setting appropriate to their needs, § 35.130(d).

58. Plaintiffs seek declaratory relief of violations of the IDEA, Section 504 and the ADA, along with injunctive and/or equitable relief of access to her education, with reasonable accommodations of the 1:1 aide; tutoring and other services to account for missed time; provision of an educational consultant to assist with S.L.'s placement going forward; stay put, followed by an appropriate private placement; and attorneys' fees and costs associated with this action and the underlying due process case.

**WHEREFORE, PREMISES CONSIDERED, PLAINTIFFS** pray that Defendant Answers this Complaint, and for all legal and equitable relief set forth herein, along with any further relief appropriate to this cause.

Respectfully submitted,

**GILBERT LAW, PLC**

s/ Justin S. Gilbert
Justin S. Gilbert (TN Bar No. 017079)
100 W. Martin Luther King Blvd, Suite 501
Chattanooga, TN 37402
Telephone: 423.756.8203

justin@schoolandworklaw.com

&

**THE SALONUS FIRM, PLC**

/s Jessica F. Salonus
JESSICA F. SALONUS (TN Bar No. 28158)
139 Stonebridge Boulevard
Jackson, TN 38305
Telephone: 731.300.0970
jsalonus@salonusfirm.com

ATTORNEYS FOR PLAINTIFF